# PROCUNIER, CORRECTIONS DIRECTOR, ET AL. *v.* NAVARETTE

No. 76–446. Argued October 11, 1977—Decided February 22, 1978

*Sanford Svetcov,* Deputy Attorney General of California, argued the cause for petitioners. With him on the brief were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *Edward P. O'Brien,* Assistant Attorney General, and *W. Eric Collins,* Deputy Attorney General.

*Michael E. Adams* argued the cause and filed a brief for respondent.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Respondent Navarette, an inmate of Soledad Prison in California when the events revealed here occurred, filed his second amended complaint on January 19, 1974, charging six prison officials with various types of conduct allegedly violative of his constitutional rights and of 42 U. S. C. §§ 1983 and 1985.[1] Three of the defendants were subordinate officials at Soledad;[2] three were supervisory officials: the director of the

---

*Leon Friedman, Joel M. Gora,* and *Alvin J. Bronstein* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

[1] Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Section 1985 proscribes certain conspiracies interfering with civil rights.

[2] The named subordinate officials were two correctional counselors at Soledad and a member of the prison staff in charge of handling incoming and outgoing prisoner mail. The complaint also referred to unnamed defendants Does I through IV.

State Department of Corrections and the warden and assistant warden of Soledad. The first three of nine claims for relief alleged wrongful interference with Navarette's outgoing mail. The first claim charged that the three subordinate officers, who were in charge of mail handling, had failed to mail various items of correspondence during the 15 months that respondent was incarcerated at Soledad, from September 1, 1971, to December 11, 1972. These items, described in 13 numbered paragraphs, included letters to legal assistance groups, law students, the news media, and inmates in other state prisons, as well as personal friends. Some of these items had been returned to Navarette, some the defendants had refused to send by registered mail as Navarette had requested, and, it was alleged, none of the items had ever reached the intended recipient. This "interference" or "confiscation" was asserted to have been in "knowing disregard" of the applicable state-wide prisoner mail regulations [3] and of Navarette's "constitutional rights," including his rights to free speech and due process as guaranteed by the First, Fifth, and Fourteenth

---

[3] Regulations promulgated January 5, 1970, permitted each inmate to send letters to 10 persons on an approved correspondence list plus other special-purpose letters as authorized. Director's Rule ("D.") 2403. Except with permission of the institutional head, correspondence with other inmates was prohibited. D. 2402 (13). The inmate was also advised:

"You may not send or receive letters that pertain to criminal activity; are lewd, obscene, or defamatory; contain prison gossip or discussion of other inmates; or are otherwise inappropriate." D. 2402 (8).

The regulations assured confidentiality for correspondence with state and federal officials and also stated:

"Nothing in these rules shall deprive you of correspondence with your attorney, or with the courts having jurisdiction over matters of legitimate concern to you." D. 2402 (10).

These regulations controlled prisoner correspondence until August 10, 1972, and were in effect at the time that all but one of respondent's letters were posted. Subsequent regulations expanded inmate correspondence rights.

Amendments to the United States Constitution. The three supervisory officers were alleged to have knowingly condoned this conduct and to have conspired with their subordinates for forbidden ends.

The second claim for relief alleged wrongful failure to mail the same items of correspondence and asserted that the "interference or confiscation" had been conducted with "bad faith disregard" for Navarette's rights. The third claim posed the same failures to mail but claimed that the "interference" or "confiscation" had occurred because the three subordinate officers had "negligently and inadvertently" misapplied the prison mail regulations and because the supervisory officers had "negligent[ly]" failed to provide sufficient training and direction to their subordinates, all assertedly in violation of Navarette's constitutional rights.

Petitioners moved for dismissal for failure to state a claim on which relief could be granted or alternatively for summary judgment. Affidavits in support of the motion and counter-affidavits opposing it were also before the District Court. By order and without opinion, the court then granted summary judgment for petitioners on the first three claims and dismissed the remaining claims for failure to state a federal claim.[4]

The Court of Appeals reversed as to the first three claims. *Navarette* v. *Enomoto,* 536 F. 2d 277 (CA9 1976). It held, first, that prisoners themselves are entitled to First and Fourteenth Amendment protection for their outgoing mail and that Navarette's allegations were sufficient to encompass proof that would entitle him to relief in damages. Second, the court ruled

---

[4] Claims 4, 5, and 6 concerned the termination of a law student visitation program in which respondent had participated and the removal of respondent from the post of prison librarian. Claims 7, 8, and 9 realleged the substance of claims 1 through 6 and sought to hold the supervisory officials liable upon a theory of vicarious rather than personal liability. All nine claims also claimed a conspiracy in violation of 42 U. S. C. § 1985.

that summary judgment on the first two claims was improper because there were issues of fact to be tried, particularly with respect to the claim that "a reasonable and good faith belief of a state official that his or her conduct is lawful, even where in fact it is not, constitutes a complete defense to a § 1983 claim for damages." *Id.,* at 280. Third, the Court of Appeals held that Navarette's "allegations that state officers negligently deprived him of [his constitutional] rights state a § 1983 cause of action" and that summary judgment on the third purported claim was "improper because, as in the case of counts one and two, viewing the evidence in the light most favorable to Navarette, we are unable to say appellees are entitled to prevail as a matter of law." *Id.,* at 282, and n. 6.[5]

We granted certiorari, 429 U. S. 1060, and the question before us is whether the Court of Appeals correctly reversed the District Court's judgment with respect to Navarette's third claim for relief alleging negligent interference with a claimed constitutional right.[6]

---

[5] The Court of Appeals also reversed the ruling of the District Court with respect to the 4th, 5th, and 6th claims on the theory that "[t]he termination or denial of prison privileges because of a prisoner's legal activities on his own behalf or those of other inmates is an impermissible interference with his or her constitutional right of access to the courts." 536 F. 2d, at 280. Since this issue is not related to the question on which we granted certiorari, we express no view on the resolution of these claims by the court below.

The Court of Appeals affirmed the District Court's dismissal of the claims based on vicarious liability (claims 7, 8, and 9) and also affirmed its dismissal of all claims predicated on 42 U. S. C. § 1985. 536 F. 2d, at 282. Neither of these issues is raised here.

[6] The questions presented in the petition for certiorari were:

"1. Whether negligent failure to mail certain of a prisoner's outgoing letters states a cause of action under section 1983?

"2. Whether removal of a prisoner as a prison law librarian and termination of a law student-inmate visitation program in which he participated states a cause of action under the Civil Rights Act for either

In support of their motion for summary judgment, petitioners argued that on the record before the court they were immune from liability for damages under § 1983 and hence were entitled to judgment as a matter of law. The claim was not that they shared the absolute immunity accorded judges and prosecutors but that they were entitled to the qualified immunity accorded those officials involved in *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974), and *Wood* v. *Strickland,* 420 U. S. 308 (1975). ·The Court of Appeals appeared to agree that petitioners were entitled to the claimed degree of immunity but held that they were nevertheless not entitled to summary judgment because in the court's view there were issues of fact to be resolved and because when the facts were viewed most favorably to respondent, it could not be held that petitioners were entitled to judgment as a matter of law. Without disagreeing that petitioners enjoyed a qualified immunity from damages liability under § 1983, respondent defends

---

knowingly or negligently interfering with the prisoner's right of access to the courts?

"3. Whether deliberate refusal to mail certain of a prisoner's correspondence in 1971–1972 prior to *Procunier* v. *Martinez,* 416 U. S. 396 (1974), and refusal to send certain correspondence by registered mail states a cause of action for violation of his First Amendment right to free expression?"

Our order granting the petition was limited to Question No. 1. In their submissions on the merits, the parties deal with this issue as subsuming the questions whether at the time of the occurrence of the relevant events the Federal Constitution had been construed to protect Navarette's mailing privileges and whether petitioners knew or should have known that their alleged conduct violated Navarette's constitutional rights. Since consideration of these issues is essential to analysis of the Court of Appeals' reversal of summary judgment on claim 3 of the complaint, we shall also treat these questions as subsidiary issues "fairly comprised" by the question presented. This Court's Rule 23.1 (c). In any event, our power to decide is not limited by the precise terms of the question presented. *Blonder-Tongue Laboratories, Inc.* v. *University Foundation,* 402 U. S. 313, 320 n. 6 (1971).

the judgment of the Court of Appeals as a proper application of § 1983 and of the Court's cases construing it.

Although the Court has recognized that in enacting § 1983 Congress must have intended to expose state officials to damages liability in some circumstances, the section has been consistently construed as not intending wholesale revocation of the common-law immunity afforded government officials. Legislators, judges, and prosecutors have been held absolutely immune from liability for damages under § 1983. *Tenney* v. *Brandhove,* 341 U. S. 367 (1951); *Pierson* v. *Ray,* 386 U. S. 547 (1967); *Imbler* v. *Pachtman,* 424 U. S. 409 (1976). Only a qualified immunity from damages is available to a state Governor, a president of a state university, and officers and members of a state National Guard. *Scheuer* v. *Rhodes, supra.* The same is true of local school board members, *Wood* v. *Strickland, supra;* of the superintendent of a state hospital, *O'Connor* v. *Donaldson,* 422 U. S. 563 (1975); and of policemen, *Pierson* v. *Ray, supra;* see *Imbler* v. *Pachtman, supra,* at 418–419.

We agree with petitioners that as prison officials and officers, they were not absolutely immune from liability in this § 1983 damages suit and could rely only on the qualified immunity described in *Scheuer* v. *Rhodes, supra,* and *Wood* v. *Strickland, supra.*[7] *Scheuer* declared:

"[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as

---

[7] The Courts of Appeals have generally accorded prison and jail administrators performing discretionary functions a qualified immunity from monetary liability under § 1983. *E. g., Knell* v. *Bensinger,* 522 F. 2d 720 (CA7 1975); *Hoitt* v. *Vitek,* 497 F. 2d 598, 601 (CA1 1974); *Dewell* v. *Lawson,* 489 F. 2d 877 (CA10 1974); *Anderson* v. *Nosser,* 438 F. 2d 183 (CA5 1971), modified on rehearing, 456 F. 2d 835 (1972); see *Bryan* v. *Jones,* 530 F. 2d 1210 (CA5), cert. denied, 429 U. S. 865 (1976).

they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." 416 U. S., at 247–248.

We further held in *Wood* v. *Strickland,* that "if the work of the schools is to go forward," there must be a degree of immunity so that "public school officials understand that action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity." 420 U. S., at 321. This degree of immunity would be unavailable, however, if the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." *Id.,* at 322. The official cannot be expected to predict the future course of constitutional law, *ibid.; Pierson* v. *Ray, supra,* at 557, but he will not be shielded from liability if he acts "with such disregard of the [plaintiff's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." 420 U. S., at 322.

Under the first part of the *Wood* v. *Strickland* rule, the immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm. Petitioners claim that in 1971 and 1972 when the conduct involved in this case took place there was no established First Amendment right protecting the mailing

privileges of state prisoners and that hence there was no such federal right about which they should have known. We are in essential agreement with petitioners in this respect and also agree that they were entitled to judgment as a matter of law.

In ruling that petitioners' conduct had encroached on Navarette's First Amendment rights, the Court of Appeals relied on two of its own decisions, one in 1973 and the other in 1974, as well as upon *Martinez* v. *Procunier,* 354 F. Supp. 1092 (ND Cal.), a 1973 three-judge court opinion with which the Court of Appeals said it was in essential agreement. The court relied on no earlier opinions, and this Court, in affirming the judgment in *Martinez* v. *Procunier,* did so on the ground that the constitutional rights of the addressees of a prisoner's correspondence were involved when prison officials interfered with a prisoner's outgoing mail. *Procunier* v. *Martinez,* 416 U. S. 396 (1974). The question of the rights of the prisoner himself was left open. The Court referred to the "tension between the traditional policy of judicial restraint regarding prisoner complaints and the need to protect constitutional rights" which has "led the federal courts to adopt a variety of widely inconsistent approaches to the problem" of constitutional challenges to censorship of prisoner mail and to the "absence of any generally accepted standard for testing the constitutionality of prison mail censorship regulations . . . ." *Id.,* at 406, 407. Some Courts of Appeals were said to have maintained a "hands off posture"; [8] others to have extended various degrees of protection to prisoners' mail.[9] The Court

---

[8] 416 U. S., at 406, citing *McCloskey* v. *Maryland,* 337 F. 2d 72 (CA4 1964); *Lee* v. *Tahash,* 352 F. 2d 970 (CA8 1965); *Krupnick* v. *Crouse,* 366 F. 2d 851 (CA10 1966); *Pope* v. *Daggett,* 350 F. 2d 296 (CA10 1965).

[9] 416 U. S., at 406–407, citing, *inter alia, Sostre* v. *McGinnis,* 442 F. 2d 178, 199 (CA2 1971) (censorship of personal correspondence must have support "in any rational and constitutionally acceptable concept of a prison system"); *Jackson* v. *Godwin,* 400 F. 2d 529 (CA5 1968) (censorship of prisoner mail must be supported by a compelling state interest); *Wilkinson* v. *Skinner,* 462 F. 2d 670, 672–673 (CA2 1972) (requiring a "clear and present danger").

referred to no relevant pronouncements by courts in the Ninth Circuit other than the one then under review; and it is apparent that Procunier, the defendant in the *Martinez* suit and in this one, was then maintaining that there was no established constitutional right protecting prison mail under which his mail regulations could be challenged.[10]

Respondent relies on *Hyland* v. *Procunier,* 311 F. Supp. 749 (ND Cal. 1970); *Gilmore* v. *Lynch,* 319 F. Supp. 105 (ND Cal. 1970), aff'd *sub nom. Younger* v. *Gilmore,* 404 U. S. 15 (1971); *Northern* v. *Nelson,* 315 F. Supp. 687 (ND Cal. 1970); *Payne* v. *Whitmore,* 325 F. Supp. 1191 (ND Cal. 1971); and *Brenneman* v. *Madigan,* 343 F. Supp. 128 (ND Cal. 1972). But none of these cases deals with the rights of convicted prisoners in their mail and none furnishes an adequate basis for claiming that in 1971 and 1972 there was a "clearly established" constitutional right protecting Navarette's correspondence involved in this case.[11]

---

[10] The jurisdictional statement filed by Procunier stated that "the vast majority of reported cases held that restrictions on the extent and character of prisoners' correspondence and examination and censorship thereof are inherent incidents in the conduct of penal institutions," but noted that in the federal courts there were "widely diverging views regarding the scope and propriety of federal intervention in matters of internal prison regulation," particularly with respect to inmate mail. Jurisdictional Statement filed in *Procunier* v. *Martinez,* O. T. 1973, No. 72–1465, p. 9.

[11] In *Hyland* v. *Procunier,* the District Court enjoined correctional officials from requiring a parolee to obtain advance permission for speeches to public gatherings. The opinion did not discuss the rights of prisoners. *Gilmore* v. *Lynch* concerned regulations limiting prisoner access to legal materials and mutual legal assistance. The decision rested on the prisoners' right to reasonable access to the courts. *Northern* v. *Nelson* upheld an inmate's right to receive a newspaper which was "necessary for effective exercise of plaintiff's right to practice the Muslim religion." 315 F. Supp., at 688. *Payne* v. *Whitmore* affirmed the inmates' First Amendment right to receive newspapers and magazines. The theory of the decision was that "prison rules must bear a reasonable relationship to valid prison goals, and rules which infringe upon particularly important rights will require a proportionately stronger justification." 325 F. Supp., at 1193. It contained no discussion concerning either the importance of prisoner correspondence

Whether the state of the law is evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court, there was no "clearly established" First and Fourteenth Amendment right with respect to the correspondence of convicted prisoners in 1971–1972.[12] As a matter of law, therefore, there was no basis for rejecting the immunity defense on the ground that petitioners knew or should have known that their alleged conduct violated a constitutional right. Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, petitioners did not act with such disregard for the established law that their conduct "cannot reasonably be characterized as being in good faith." *Wood* v. *Strickland,* 420 U. S., at 322.[13]

---

rights or the type of correspondence rules which would be reasonable. Toward the end of the relevant period, in May 1972, *Brenneman* v. *Madigan* held that pretrial detainees had a First Amendment right in their correspondence. The court recognized, however, that "[p]re-trial detainees do not stand on the same footing as convicted inmates." 343 F. Supp., at 142.

[12] Although some of the items of correspondence with which respondent claims interference concerned legal matters or were addressed to lawyers, respondent is foreclosed from asserting any claim with respect to mail interference based on infringement of his right of access to the courts because such a claim was dismissed with prejudice in an earlier phase of this case. Order of Feb. 9, 1973, No. C–72–1954 SW (ND Cal.). In his Points and Authorities Against Motion to Dismiss filed in connection with the present complaint on April 17, 1974, respondent stated that "[t]he claim against mail interference does not purport to allege denial of access to the courts," and explained that "[i]n ruling on defendants' previous Motion to Dismiss, in February, 1973, this Court dismissed plaintiff's claim against mail interference insofar as it alleged denial of access to the courts." Record 171.

[13] There is thus no occasion to address this case on the assumption that Navarette's mailing privileges were protected by a constitutional rule of which petitioners could reasonably have been expected to be aware in 1971 and 1972 and to inquire whether petitioners knew or should have known that their conduct was in violation of that constitutional proscription.

Neither should petitioners' immunity defense be overruled under the second branch of the *Wood* v. *Strickland* standard, which would authorize liability where the official has acted with "malicious intention" to deprive the plaintiff of a constitutional right or to cause him "other injury." This part of the rule speaks of "intentional injury," contemplating that the actor intends the consequences of his conduct. See Restatement (Second) of Torts § 8A (1965). The third claim for relief with which we are concerned here, however, charges negligent conduct, which normally implies that although the actor has subjected the plaintiff to unreasonable risk, he did not intend the harm or injury that in fact resulted. See *id.*, at § 282 and Comment *d*. Claims 1 and 2 of the complaint alleged intentional and bad-faith conduct in disregard of Navarette's constitutional rights; but claim 3, as the court below understood it and as the parties have treated it, was limited to negligence. The prison officers were charged with negligent and inadvertent interference with the mail and the supervisory personnel with negligent failure to provide proper training. To the extent that a malicious intent to harm is a ground for denying immunity, that consideration is clearly not implicated by the negligence claim now before us.[14]

We accordingly conclude that the District Court was correct in entering summary judgment for petitioners on the third claim of relief and that the Court of Appeals erred in holding otherwise. The judgment of the Court of Appeals is

*Reversed.*

MR. CHIEF JUSTICE BURGER, dissenting.

I dissent because the Court's opinion departs from our practice of considering only the question upon which certiorari

---

[14] Because of the disposition of this case on immunity grounds, we do not address petitioners' other submissions: that § 1983 does not afford a remedy for negligent deprivation of constitutional rights and that state prisoners have no First and Fourteenth Amendment rights in their outgoing mail.

was granted or questions "fairly comprised therein." This Court's Rule 23 (1)(c). We agreed to consider only one question: "Whether negligent failure to mail certain of a prisoner's outgoing letters states a cause of action under section 1983?" The Court decides a different question: Whether the petitioners in this case are immune from § 1983 damages for the negligent conduct alleged in count three of Navarette's complaint. That question is not "comprised" within the question that we agreed to consider. Nor is this case within any "well-recognized exception" to our practice. See *Blonder-Tongue Laboratories, Inc.* v. *University Foundation,* 402 U. S. 313, 320 n. 6 (1971); R. Stern & E. Gressman, Supreme Court Practice § 6.37, p. 298 (4th ed. 1969).

The District Court granted summary judgment for the petitioners, without opinion, on a claim that petitioners confiscated Navarette's mail in the course of a negligent and inadvertent application of mail regulations. The meaning of that allegation is by no means clear. Navarette may have intended to allege that petitioners were aware of the nature of the mail and intentionally confiscated it because they did not understand prison regulations. Or it may be that Navarette intended to claim that petitioners, apart from their understanding of prison mail regulations, confiscated the mail because they were mistaken as to its nature. The Court of Appeals appears to have adopted the latter interpretation of the allegation although its opinion is not entirely clear. It described the pertinent cause of action as alleging acts "committed negligently." Having decided that the complaint alleged negligent acts, the Court of Appeals addressed the issue of whether a negligent act can give rise to § 1983 liability. It decided that "a deprivation of rights need not be purposeful to be actionable under § 1983" and held that Navarette's allegation "that state officers negligently deprived him of [his rights] state[s] a § 1983 cause of action."

The question before us is whether deprivation of a constitutional right by negligent conduct is actionable under § 1983.

Neither the language nor the legislative history of § 1983 indicates that Congress intended to provide remedies for negligent acts.

I would hold that one who does not intend to cause and does not exhibit deliberate indifference to the risk of causing the harm that gives rise to a constitutional claim is not liable for damages under § 1983. I would then remand the case to the Court of Appeals to construe the ambiguous complaint and determine whether the allegation regarding misapplication of prison mail regulations states a § 1983 cause of action.

MR. JUSTICE STEVENS, dissenting.

Today's decision, coupled with *O'Connor* v. *Donaldson,* 422 U. S. 563, strongly implies that every defendant in a § 1983 action is entitled to assert a qualified immunity from damage liability. As the immunity doctrine developed, the Court was careful to limit its holdings to specific officials,[1] and to insist that a considered inquiry into the common law was an essential precondition to the recognition of the proper immunity for any official.[2] These limits have now been abandoned. In *Donaldson,* without explanation and without reference to the common law, the Court held that the standard for judging the

---

[1] Thus, in *Wood* v. *Strickland,* 420 U. S. 308, 322, the Court stated:

"Therefore, *in the specific context of school discipline,* we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." (Emphasis added.)

[2] In *Imbler* v. *Pachtman,* 424 U. S. 409, 421, the Court stated:

"As noted above, our earlier decisions on § 1983 immunities were not products of judicial fiat that officials in different branches of government are differently amenable to suit under § 1983. Rather, each was predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it."

immunity of the superintendent of a mental hospital is the same as the standard for school officials; today the Court purports to apply the same standard to the superintendent of a prison system and to various correction officers.[3]

I have no quarrel with the extension of a qualified immunity defense to all state agents. A public servant who is conscientiously doing his job to the best of his ability should rarely, if ever, be exposed to the risk of damage liability. But when the Court makes the qualified immunity available to all potential defendants, it is especially important that the contours of this affirmative defense be explained with care and precision. Unfortunately, I believe today's opinion significantly changes the nature of the defense and overlooks the critical importance of carefully examining the factual basis for the defense in each case in which it is asserted.

The facts of this case have been developed only sketchily. Because the District Court granted a motion for summary judgment, we must accept Navarette's version of the facts as true.[4] The Court of Appeals remanded six of his claims for

___

[3] Perhaps with good reason, see *Whirl* v. *Kern*, 407 F. 2d 781, 791-792 (CA5 1969), the Court does not consult the common law to gauge the scope of a jailer's immunity. Cf. *Imbler* v. *Pachtman, supra*, at 421; *Wood* v. *Strickland, supra*, at 318. Instead, the Court seems to rely on an unarticulated notion that prison administrators deserve as much immunity as Governors, school administrators, hospital administrators, and policemen. *Ante*, at 561, and n. 7. The Court also elides any distinction between discretionary and ministerial tasks. Cf. *Scheuer* v. *Rhodes*, 416 U. S. 232, 247. One defendant in this case was joined simply because he "was in charge of handling incoming and outgoing prisoner mail." Although the scope of this defendant's duties is not clear, he may well have been performing wholly ministerial chores, such as bagging and delivering prison mail. By allowing summary judgment in his favor, the Court strongly suggests that the nature of his job is irrelevant to whether he should have a good-faith immunity.

[4] For purposes of decision, the Court also makes an assumption about the law that applies to this case. Like the Court, I shall assume, without deciding, that a guard who negligently misreads regulations and improperly interferes with a prisoner's mail has violated § 1983.

trial. These claims tell us that prison officials prevented Navarette from corresponding with legal assistance groups, law students, the news media, personal friends, and other inmates with legal problems or expertise. Some of this mail was deliberately confiscated because the guards regarded Navarette as a troublesome "writ-writer" and some was mishandled simply because the guards were careless in performing their official duties.

To establish their defense, all the defendants except Procunier have filed an affidavit stating that they made a good-faith effort to comply with prison mail regulations while handling Navarette's mail.[5] But Navarette's affidavit challenges this assertion. According to Navarette, the prison warden took the position, despite contrary prison regulations, that officials had a right to confiscate any mail, "if we don't feel it is right or necessary." Record 78. Navarette also claims that his writ-writing activities led authorities to punish him by taking away his job as a prison librarian and by seizing his mail.

With the record in this state, the defendants have not established good faith. The heart of the good-faith defense is the manner in which the defendant has carried out his job.[6]

---

[5] Procunier filed neither an answer nor an affidavit. The affidavit filed by the other defendants states:

"Insofar as I handled, approved, returned or otherwise dealt with the mail of Apolinar Navarette, such actions were at all times taken in good faith effort to comply with the applicable regulations then in force of the Director of the Department of Corrections or the superintendent of the institution. At no time did I maliciously interfere with or confiscate plaintiff's mail, or conspire with others to so act, in violation of applicable regulations." Record 142.

[6] This is the principle we have turned to in fashioning more specific rules. In *Wood* v. *Strickland, supra,* for example, the Court said that the goal of the good-faith doctrine is to allow officials to do their jobs faithfully without fear:

"[H]owever worded, the immunity must be such that public school officials understand that action taken in the good-faith fulfillment of their

A public official is entitled to immunity for acts performed in the regular course of duty if he sincerely and reasonably believed he was acting within the sphere of his official responsibility. See *Scheuer* v. *Rhodes*, 416 U. S. 232, 247–248. The kind of evidence that will adequately support the defense will vary widely from case to case. Some defendants, especially those without policymaking responsibility, may establish their defense by showing that they abided by the institution's regulations or by its long-followed practices. Other officials, whose exercise of discretion is given greater deference by the courts, see *Scheuer* v. *Rhodes, supra*, may have a correspondingly greater duty to consider the legal implications of their conduct.

*Wood* v. *Strickland*, 420 U. S. 308, pointed out two specific instances in which an official might forfeit his good-faith defense by deviating from a reasonable performance of his job. An official does not carry out his official duties properly if he chooses a course of conduct that he knows, or should know, is unconstitutional. *Id.*, at 322. Similarly, an official steps outside his proper role when he uses his powers to inflict constitutional or other harm on an individual for reasons unrelated to the performance of his duty.[7] Selective and malicious enforcement of the law is not good faith.

---

responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity." 420 U. S., at 321.

[7] Referring to *Wood* v. *Strickland*, the Court in *O'Connor* v. *Donaldson*, 422 U. S. 563, 577, stated:

"Under that decision, the relevant question for the jury is whether O'Connor 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [Donaldson], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [Donaldson].' [420 U. S.,] at 322."

Thus, both in *Wood* and in *O'Connor*, the Court expressly stated that the defendant would forfeit his qualified immunity if he acted with the

Under this standard, Navarette may well be able to defeat these defendants' affirmative defense of good faith. He has alleged, and therefore we must assume, that the defendants did not in fact act within the sphere of their accepted responsibilities. If they carelessly disregarded the standards which their superiors directed them to follow, they would be unable to make the threshold showing necessary to establish good faith. Whether or not that showing can be made in this case depends on a resolution of the conflict between Navarette's allegations of negligence and the statements in defendants' affidavit.

The defendants fare no better if we limit our attention to the two examples of bad faith set out in *Wood* v. *Strickland, supra.* The *Wood* Court stated that actual malice—the intent to cause constitutional or other injury—cannot be good faith; a defendant may not have the benefit of the good-faith defense if he misuses his powers by singling out the plaintiff for special and unfair injuries.[8] In this case, malice is alleged in some of the plaintiff's claims, and we must assume that it can be proved. The evidence might show that the defendants intentionally confiscated some of Navarette's mail as a punishment and that they negligently mislaid other letters. A jury might then find that the defendants' animus toward Navarette so tainted their handling of his mail that the good-faith defense should be denied them even with respect to harm caused by their negligence. Only by qualifying its previous teaching about this defense can the Court regard evidence of the defendants' ill will toward the plaintiff as totally irrelevant to any claim that he may have for harm caused by the negligent performance of their duties.

The *Wood* Court also noted that a plaintiff may successfully rebut a claim of immunity based on the defendant's good-

---

malicious intention to cause a deprivation of constitutional rights or if he deliberately intended to cause "other injury."

[8] See n. 7, *supra.*

faith performance of official duties by demonstrating that the defendant knew, or should have known, that he was acting unconstitutionally. I think the Court is correct in concluding that the First Amendment's applicability to an inmate's correspondence was not so well established in 1971 that the defendants should have known that interfering with a prisoner's routine mail was unconstitutional. That does not, however, foreclose the argument that the official neglect alleged in this case implicated a different constitutional right—the prisoner's right of access to the courts. In 1971, Navarette had a well-established right of access to the courts and to legal assistance.[9] Cutting off his communications with law students and legal assistance groups violated this right. While the lower echelon employees may have been under no obligation to read advance sheets, a jury might conclude that

---

[9] Access to the courts through the mails has been constitutionally protected since 1941, when *Ex parte Hull*, 312 U. S. 546, held that the State could not constitutionally refuse to mail a prisoner's inartful pleadings to the courts. In *Johnson* v. *Avery*, 393 U. S. 483, this Court recognized that the right of access to the courts included a right of access to legal assistance. *Johnson* held that, in the absence of alternative sources of assistance, prisoners must be allowed to consult inmate "writ-writers." *Id.*, at 490. In *Younger* v. *Gilmore*, 404 U. S. 15, this Court summarily affirmed a three-judge court decision ordering the California Department of Corrections to heed the *Johnson* decision and abandon a prison rule making it difficult for inmates to get legal help from writ-writers. See *Gilmore* v. *Lynch*, 319 F. Supp. 105, 112 (ND Cal. 1970). By the time of the acts in question here, the right of access to the courts clearly included a right to communicate with legal assistance groups and law students:

"Johnson v. Avery clearly stands for the general proposition that an inmate's right of access to the court involves a corollary right to obtain some assistance in preparing his communication with the court. Given that corollary right, we fail to see how a state, at least in the absence of some countervailing interest not here appearing, can prevent an inmate from seeking legal assistance from bona fide attorneys working in an organization such as the Civil Liberties Union." *Nolan* v. *Scafati*, 430 F. 2d 548, 551 (CA1 1970) (footnote omitted).

at least some of these defendants should have known that at least some of Navarette's mail was entitled to constitutional protection.[10] Certainly the question whether correction officers should be charged with knowledge of a constitutional right to communicate with law students and legal assistance groups could be better answered after, rather than before, trial. Cf. *O'Connor* v. *Donaldson,* 422 U. S., at 576–577; *Donaldson* v. *O'Connor,* 519 F. 2d 59 (CA5 1975).

In sum, I am persuaded that the Court has acted unwisely in reaching out to decide the merits of an affirmative defense before any evidence has been heard and that the record as now developed does not completely foreclose the possibility that the plaintiff might be able to disprove a good-faith defense that has not yet even been pleaded properly.[11]

Accordingly, I respectfully dissent from the decision to decide a question which is not properly presented and from the way the Court decides that question.

---

[10] Although Navarette no longer relies on his access rights to establish the defendants' liability, *ante,* at 565 n. 12, he surely may attempt to prove a violation of these rights to rebut a claim of good faith.

[11] The license the Court has taken with normal pleading requirements is perhaps best illustrated by the grant of immunity to the defendant Procunier, the Director of the State Department of Corrections, who has filed neither an answer nor an affidavit. For all the record shows, Procunier may have been expressly advised by counsel that the mail regulations were being unconstitutionally enforced, and despite that advice he may have deliberately instructed his subordinates to punish this uniquely bothersome writ-writer. Even such a remote possibility must be considered before summary judgment is approved. As Judge Aldrich has put it, "even an andabata holds the field until someone comes forward to defeat him." *Mack* v. *Cape Elizabeth School Bd.,* 553 F. 2d 720, 722 (CA1 1977).