Juan and Maria MARRERO, Plaintiffs,

v.

The CITY OF HIALEAH, FLORIDA and
Paul Rashkind, Defendants.

Civ. A. No. 78–791–CIV–JLK.

United States District Court,
S.D. Florida.

March 8, 1984.

Joseph C. Brannen, Coral Gables, Fla., for plaintiffs.

Fred Ober, Miami, Fla., for defendant City of Hialeah.

Roy Wood, Miami, Fla., for defendant Paul Rashkind.

## OPINION AND ORDER

THEIS, District Judge, Sitting by Designation.

This aged civil rights case was called for trial on Monday, January 30, 1984. A jury was empaneled the next day, and that jury heard evidence through February 7th. Because the only two defense witnesses were permitted to testify out of turn to eliminate scheduling conflicts, all of the evidence was in when the plaintiffs rested their case. The case is currently before the Court on the motions of both defendants for directed verdicts. For the reasons that follow, both of these motions must be granted.

## I. BACKGROUND

Because the case is before the Court on directed verdict motions by the defendants, the evidence that was introduced during the trial must be viewed in the light most favorable to the Marreros, *see, e.g., Boeing v. Shipman*, 411 F.2d 365 (5th Cir.1969). The following summary of the facts resolves all factual disputes in the Marreros' favor.

### 1. Factual Background

The events that form the basis of this case can be traced back to early 1976, when two detectives from the Hialeah, Florida, police department, Fermin Rodriguez and Philip Rydzewski, were investigating a rash of residential burglaries. In the course of the investigation, two juveniles were arrested, and those juveniles admitted to approximately twelve burglaries. The juveniles also indicated that they were selling the jewelry they had stolen during these burglaries to a man named "Marrero," apparently the son of the plaintiffs.

As the investigation continued, the juveniles were taken to a Hialeah store called "El Sagrado Corazon," on June 15 and 16, 1976. The store carried religious artifacts and jewelry, and was owned by a corporation of which the Marreros were the sole officers and stockholders. The juveniles saw three items on display in "El Sagrado Corazon" that they believed to be items previously stolen by them and sold to "Marrero," namely, a baby bracelet, a gold bracelet with brown stones, and a pair of cuff links. The juveniles prepared drawings of these three items.

Armed with this information, Rodriguez and Rydzewski applied, on June 22, 1976, for a search warrant. The warrant was issued that same day, and listed, as the property to be searched for and seized, all of the jewelry items that the victims of the twelve burglaries had reported stolen. This list comprised some twenty items.

Before executing the search warrant, Rodriguez and Rydzewski requested the State Attorney's Office in Dade County, Florida, to designate an Assistant State Attorney to accompany them on the execution. Defendant Paul Rashkind, an Assistant State Attorney, received the necessary designation from his superiors and accompanied Rodriguez and Rydzewski to "El Sagrado Corazon," as did an undetermined number of other police officers and technicians, perhaps numbering as many as a dozen. This entourage arrived at "El Sagrado Corazon" at about four o'clock on the afternoon of June 22, 1976.

By some mechanism not identified with certainty during the trial, representatives of the news media arrived at the store at about the same time as the police. The evidence was conflicting on the number of television stations represented at the scene, ranging from one station by the defend-

ants' evidence, to all of the four or five local stations by the plaintiffs' evidence.

Rodriguez and Rydzewski were unable to identify with assurance any item listed on the search warrant after searching the store. They then conferred with Rashkind and decided to call in several of the burglary victims, to see if those victims could identify any of their property in the store's inventory. The first two victims identified nothing, but the third victim identified a gold bracelet with brown stones in the store's inventory as being an item earlier stolen from her residence. A "gold bracelet with brown stones" was listed on the search warrant. This particular bracelet was one manufactured by an employee of "El Sagrado Corazon," and was one of approximately three hundred such bracelets made.

Once this single item had been identified, the detectives began the difficult task of sifting through the inventory to determine which items fit within the general descriptions in the search warrant. By the time this task was completed, some 800 items worth $75,000 had been seized. Juan and Maria Marrero were arrested for receipt of stolen property.

As the Marreros were being taken out of their store, then-Lieutenant in the Hialeah police department, Cecil B. Seay, made an announcement to the assembled media. The tenor of this announcement was that the largest stolen-jewelry fencing operation in southern Florida had just been broken up, and that some $75,000 worth of stolen jewelry had just been recovered. The announcement, when coupled with the television pictures of the Marreros and their store, served to personally identify the Marreros as the fences. Seay was the only city or county functionary to make any statements to the press in front of the store.

The story was picked up by the local newspapers as well. On June 23, 1976, a four-sentence story appeared in *The Miami Herald.* This story consisted of the standard press-release fare, reporting only that the Marreros had been arrested and charged, and that items suspected of having been stolen were seized. Every statement made in this article is true. On June 24, 1976, a five-sentence story appeared on the front page of the Spanish-language newspaper *El Sol de Hialeah.* This article used less-guarded language, and had much the same tenor as the statement made by then-Lieutenant Seay.

After the seized property had been inventoried, it was displayed in the Hialeah police station. Publicity was given to this display, but the Marreros were not identified by name in the publicity, nor was "El Sagrado Corazon" identified as the source of the recovered property. Members of the general public who had some proof of a loss by burglary—a police report or an insurance claim, for example—were permitted to view the displayed goods. Five more items were tentatively identified as stolen, and criminal charges were brought against the Marreros.

In the course of those criminal proceedings, the Marreros moved to suppress all of the evidence seized from their store. This motion was granted, on April 26, 1977, by a Florida state judge, who ruled that only the gold bracelet with brown stones could be proceeded upon. In the course of events, all criminal charges against the Marreros were dropped, and even the gold bracelet with brown stones was eventually returned to them.

The Marreros claim to have been damaged in several respects by these events. Their principal injuries comprise the damage to their personal and business reputations, and the destruction of "El Sagrado Corazon" as a going concern through a substantial loss of business.

### 2. Procedural Background

The original complaint in this case was filed on February 22, 1978, naming the City of Hialeah [the City], Rashkind, and the State Attorney for Dade County, Florida, Janet Reno, as defendants. Although she was State Attorney at the time the complaint was filed, Reno was not the State

Attorney at the time the search and seizure took place.

The case was dismissed in its entirety by this Court on May 16, 1978, for failure to state a claim. Relying on the existing case law, this Court concluded that the City was not subject to suit under § 1983, and that Rashkind and Reno were absolutely immune from suit.

The United States Court of Appeals for the Fifth Circuit disagreed with these conclusions, *Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir.1980). That Court concluded that the Marreros should be permitted to amend their complaint against the City to comply with the intervening case of *Monell v. Department of Social Services of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and that Rashkind was not entitled to absolute immunity on the facts pleaded by the Marreros. Reno's dismissal was affirmed, but the Fifth Circuit reversed and remanded the remainder of the case.

The Marreros amended their complaint to allege an unconstitutional custom or policy of the City, although they did not state any facts with particularity to support this allegation. This Court subsequently dismissed the complaint against the City for a second time, on November 20, 1981, because the allegations, even if taken as true, showed only a single alleged incident of unlawful conduct, from which a custom or policy could not logically be inferred.

Once again, the United States Court of Appeals for the Eleventh Circuit disagreed with this disposition of the case.. In a half-page per curiam opinion, that Court essentially held that the Marreros, having alleged—however inartfully—a custom or policy, "should be given the opportunity to prove it," *Marrero v. City of Hialeah*, 685 F.2d 1388 (11th Cir.1982). The case was once again reversed and remanded, and eventually called for trial on January 30, 1984.

## II. MOTIONS FOR DIRECTED VERDICTS

At the close of the plaintiff's case, both the City and Rashkind moved for directed verdicts. Because the issues to be considered for each motion differ significantly, each will be treated separately.

### 1. The City's Motion for a Directed Verdict

Prior to 1978, municipalities were not included within the definition of a "person" under § 1983, and were, therefore, immune from suit under that section. *Monroe v. Pape*, 365 U.S. 167, 187–92, 81 S.Ct. 473, 484–86, 5 L.Ed.2d 492 (1961). This particular holding of *Monroe* was overruled by *Monell, supra*. *Monell* is obviously the proper place to begin the task of determining the City's liability, on the facts of this case, under § 1983.

After exhaustively analyzing the legislative history of the predecessor of § 1983, Justice Brennan wrote that

> Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies.

*Monell*, 436 U.S. at 690, 98 S.Ct. at 2035 (emphasis in original) (footnote omitted). The inclusion of municipalities within the definition of a "person" under § 1983 came with an important caveat, however:

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels ....

On the other hand ... Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.

*Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36 (emphasis in original) (footnote omitted).

Two channels were, therefore, available to the Marreros by which they could establish liability on the City's part. First, the Marreros could show that the City had a formally adopted custom or policy whose execution caused the Marreros' constitutional injury. Second, the Marreros could show that the City had an informal custom or policy, whether contrary to officially stated policy or not, whose execution caused the Marreros' constitutional injury.

Several witnesses testified about the formally adopted policies of the City. Robert Spiegel, the public information officer for the City's police department, testified as to three formal policies. First, he testified that it is the policy of the City to permit officers present at the scene of a crime or arrest to state facts, without opinions, to representatives of the news media also at the scene. Second, he testified that it is the policy of the City to place recovered property that is suspected of being stolen on public display and to permit individuals with some proof of loss to examine it, in an attempt to identify the property and return it to its lawful owners. Third, he testified that it is the policy of the City, in connection with these public displays, to diligently refrain from identifying the source of the property or the person or business from which it was recovered. Spiegel's testimony on these policies was completely uncontroverted.

Now-Chief of Police of the Hialeah police department, Cecil B. Seay, also testified that these three policies are officially adopted policies of the City. Finally, William Cauchi, with the Miami police department, testified that these same policies are also followed by his police department. The testimony by these two individuals was likewise uncontroverted.

The result of the admission of this testimony into evidence is the establishment, for the purposes of this case, of these three policies as the officially promulgated and adopted policies of the City. Such establishment is of no avail for the Marreros, however. These policies are completely lawful and, in any event, are utterly unconnected to the deprivation of any of the Marreros' constitutional rights. In fact, had these policies been scrupulously observed by the City's employees in the first place, the Marreros would not have had even a colorable claim of any constitutional deprivation.

Recognizing this, the Marreros alleged an informal custom or policy of the City, to which the supposed violation of their civil rights could be attributed. The precise nature of this informal custom or policy remained undefined and shrouded in mystery throughout the trial. When the Marreros rested their case, the Court expressly questioned their lawyer about the details of the informal custom or policy on which the Marreros were claiming to rely. Their lawyer responded by stating that the City has an informal policy of making slanderously unsupported statements on the occasion of arrests in which suspected criminal activity is stated as a proven fact, without according the arrestees even the due process rudiments of notice and the opportunity to be heard, *see Goldberg v. Kelly*, 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1969), on these very serious criminal allegations. The Court views this statement as nothing but a searchlight casting for faults in the clouds of delusion.

■ Viewed in the light most favorable to the Marreros, as it must be on a directed verdict motion against them, the evidence in this case establishes that then-Lieutenant Seay made a slanderous remark to the news media to the effect that the Marreros were running the largest stolen-jewelry

fencing operation in southern Florida, and that they had $75,000 worth of stolen jewelry in their possession. The evidence further shows that libelous remarks were published in *El Sol de Hialeah* that closely paralleled Seay's comments. As a matter of law, this evidence is simply insufficient to show a custom or policy of the City.

No evidence was introduced to show that the City ratified, condoned, accepted, intentionally overlooked—or, indeed, even knew—of Seay's antics. At the most, this evidence shows that Seay committed a tort by slandering the Marreros. This is precisely the type of wrongdoing for which *Monell* emphatically states that a city cannot be held liable—namely, that the City employed a tortfeasor. Additionally, although *El Sol de Hialeah* may have also committed a tort by libeling the Marreros, this Court can discern no theory—sounding in respondeat superior or otherwise—under which the acts of this independent newspaper can be attributed to the City. No evidence was introduced to show, or even suggest, that the *El Sol de Hialeah* article was written or distributed by City functionaries.

Had the Marreros introduced any evidence whatsoever that City functionaries had made slanderously unsupported charges of criminal activity against other subjects of searches and seizures on other occasions—or even on one other occasion—a different case might be presented. The informal custom or policy coverage of § 1983 is precisely tailored to reach just such repetitive misconduct that is either intentionally overlooked or tacitly approved, even though in direct conflict with officially stated policy. One incident, however, cannot a custom or policy make. If it could, *Monell's* requirement of something more for municipal liability than the mere employment of a tortfeasor would be completely eviscerated. The former Fifth Circuit implicitly recognized this problem by stating that a custom or policy cannot "be inferred from [the] single alleged incident of unlawful conduct" alleged in the original complaint, *Marrero,* 625 F.2d at 512.

Because the Marreros have failed to introduce any evidence tending to create even a colorable jury question as to the existence of a custom or policy of the City to which the alleged deprivation of the Marreros' civil rights can be attributed, *Monell* requires this Court to direct a verdict in favor of the City.

### 2. *Rashkind's Motion for a Directed Verdict*

In determining the outlines of Rashkind's liability, this Court has the benefit of extensive guidance from the former Fifth Circuit, *see Marrero,* 625 F.2d at 503–11. A brief review of that guidance will be helpful in organizing the arguments of the parties on the directed verdict motion.

At the time of the Fifth Circuit's opinion, the Marreros were pressing two separate claims against Rashkind. First, they charged that Rashkind abused the search and seizure laws of the United States, in violation of the Fourth Amendment. Second, they charged that Rashkind had slandered their personal and business reputations, in violation of the Fourteenth Amendment. In the course of the trial, the Marreros utterly failed to produce any evidence tending to show that Rashkind had made any public statements about the Marreros at all, whether slanderous or not. The only issue remaining is, therefore, whether Rashkind violated the Marreros' rights under the Fourth Amendment.

In regard to this claim, the Fifth Circuit concluded that Rashkind was entitled to, at most, a qualified immunity for his actions at the Marreros' store, *Marrero,* 625 F.2d at 506–11. The Fifth Circuit further noted that

> It then remains for the trial court, upon development of the facts, to determine, with respect to [the] challenged activity, whether Rashkind was acting within or outside the scope of his discretionary activities, and, accordingly, whether he is entitled to qualified immunity or no immunity at all.

*Marrero,* 625 F.2d at 504, n. 4.

■ Rashkind called William Richey, a former Deputy State Attorney and Rash-

kind's supervisor at the time of the search and seizure, to testify on these issues. Richey testified that accompanying police officers on the execution of search warrants is within the ordinary duties of assistant state attorneys, that the presence of assistant state attorneys at the scene of a search and seizure entails the performance of discretionary duties, that Rashkind had been designated by Richey to accompany the police officers, and that Rashkind was acting within the scope of his discretionary duties. The Marreros not only failed to controvert this testimony, but agreed that Rashkind had the proper authority to be present at the Marreros' store and that he was acting within the scope of his discretionary duties. Rashkind is, therefore, entitled to a qualified immunity for his activities at the Marreros' store, regardless of what those activities may have comprised.

■ Traditionally, qualified immunity, when properly pleaded as an affirmative defense and supported by a showing that the challenged actions were taken pursuant to discretionary authority, shifted the burden to the plaintiff

> to show either that a subjective, bad faith intent to harm him motivated the official or that the official knew or should have known that his action infringed a clearly established constitutional right of the plaintiff.

*Douthit v. Jones*, 619 F.2d 527, 534 (5th Cir.1980). The Supreme Court subsequently modified these requirements in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), by dispensing with the subjective test of official good faith, *id.*, 102 S.Ct. at 2737–39. All that remains is the objective standard:

> government officials performing discretionary functions generally are shielded from liability insofar as their conduct does not violate clearly established statutory or constitutional rights.

*Harlow*, 102 S.Ct. at 2738–39; *see also Saldana v. Garza*, 684 F.2d 1159, 1162–65 (5th Cir.1982). The Marreros, therefore, bear the burden of producing objective proof of Rashkind's lack of good faith.

■ The standards under which such a showing must be made are quite well-defined:

> An official is liable under § 1983 "if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights" of the person affected. The fulcrum ... is the existence, at the time of the official's action, of clearly established judicial decisions that make his action unconstitutional.

*Bogard v. Cook*, 586 F.2d 399, 411 (5th Cir.1978), *cert. denied*, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979) (*quoting Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975)); *see also Rheaume v. Texas Department of Public Safety*, 666 F.2d 925, 930 (5th Cir. 1982); *Barker v. Norman*, 651 F.2d 1107, 1121 (5th Cir.1981). Stated another way, the Marreros can only defeat Rashkind's qualified immunity by showing that

> the constitutional right allegedly infringed by [him] was clearly established at the time of [his] conduct, [that he] knew or should have known of that right, and [that he] knew or should have known that [his] conduct violated the constitutional norm.

*Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978); *Douthit*, 619 F.2d at 533. The interrelationship of two separate factors convinces this Court that, as a matter of law, Rashkind's qualified immunity is not defeated by the Marreros.

### A. The Search Warrant

The first factor is the wording of the search warrant under which the jewelry was seized from the Marreros' store. The warrant describes some twenty items of property to be seized, as follows:

> A gold religious cross, a gold chain, gold earrings, a silver colored wedding ring set with diamonds, a St. Christopher watch, a Chrongraph [sic] watch, a woman's diamond watch with a black band, a ladies one karat [sic] white gold diamond ring, 14 karat gold cuff links with a

brown inlaid stone, a coin collection of silver coins and two dollar bills, a woman's gold ring, silver colored watches, a coin collection, a pair of silver colored earrings with two pearls on each earring, two gold baby bracelets and an Accutron watch with a wood trim face, a gold bracelet with brown stones and a man's gold initial ring with the initials "SS."

Search Warrant, Plaintiffs' Exhibit 6, Inventory Attached as Exhibit B (addresses of six burglaries omitted).

The particularity problems inherent in such general descriptions are immediately apparent. In any jewelry-store inventory, there are bound to be many examples of "gold earrings," "a woman's gold ring," and "a gold chain." The search warrant provided no guidance to Rodriguez and Rydzewski on how to distinguish perfectly legitimate earrings, watches, and chains in the Marreros' inventory from the stolen earrings, watches, and chains that they were authorized to seize. In the face of this difficulty, the detectives, predictably, seized everything in the store that arguably fit within one of the very general descriptions in the search warrant.

■ In making the determination of which items to seize under the warrant, Rodriguez and Rydzewski were exercising precisely the type of discretion that the Fourth Amendment generally, and the particularity requirement specifically, were designed to prevent. *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). For the same reason that warrants that leave to the executing officers the discretion of deciding what materials in a business inventory are obscene, *United States v. Marti*, 421 F.2d 1263, 1268 (2d Cir.1970), or what films in a film distributor's inventory are illegally reproduced, *United States v. Drebin*, 557 F.2d 1316, 1322–23 (9th Cir.1977), are constitutionally deficient, so too the warrant in this case, which left to the executing officers the discretion of deciding which items in the Marreros' inventory were stolen, is constitutionally deficient.

This Court is not the first to criticize the language in the warrant in this case. When the State of Florida attempted to prosecute the Marreros for buying, receiving, and concealing stolen property in violation of Florida Statute 812.031, a Florida judge ordered that all of the seized jewelry, with the exception of the gold bracelet with brown stones that had been specifically identified during the search and specifically listed in the warrant, be suppressed. *The State of Florida v. Adelfo, Maria, and Juan Marrero*, No. 76–5864 (11th Judicial Circuit Court for Dade County, Florida, *unpub.*, April 26, 1977). The Florida judge wrote that

the Hialeah police in the execution of the search warrant had no probable cause to seize any items of property not particularly described in the search warrant. The wholesale seizure of the some 800 items in the number and manner as was conducted in this case went far beyond the scope and limited authority to search for specified items and thus constituted an unreasonable search and seizure of all of the other items ....

*Id.* at 2.

Although the clear invalidity of the search warrant would appear to lay an attractive predicate for liability based on a violation of the Fourth Amendment, the Marreros failed to pursue this issue at the trial. Instead, they conceded the validity of the search warrant, and sought only to introduce the criminal court's suppression of the evidence, apparently to show the unreasonableness of the seizure—which unreasonableness, appropriately couched in Fourth Amendment terms, might then have been laid at Rashkind's door.

■ This theory of the case led to a curious evidentiary posture for the search warrant. Although the warrant was clearly invalid, as a matter of law, the parties agreed that the warrant, as a legal abstraction, was constitutionally sufficient. Of course, the invalidity of the warrant itself can hardly be charged to Rashkind, inasmuch as the language in the warrant was specifically approved by a judge of the

Eleventh Judicial Circuit Court for Dade County, Florida, before the warrant was executed. Rashkind, out of law school only seven months at the time of the search, can hardly have been expected to have disagreed with a judge on the propriety of the language in the warrant. Under these circumstances, this Court must proceed, as did Rashkind, on the assumption that the warrant was sufficient to pass constitutional muster.

### B. The State of Fourth Amendment Jurisprudence

The curious evidentiary posture of the search warrant becomes pivotal in assessing the state of the case law as it existed on the afternoon of the search and seizure. The mere statement of the problem is sufficient to demonstrate its insolubility.

To defeat Rashkind's qualified immunity, the Marreros must demonstrate the existence "of clearly established judicial decisions that make his action[s during the seizure] unconstitutional," *Rheaume*, 666 F.2d at 930, or the existence of a "clearly established" constitutional right that Rashkind both knew or should have known of, and knew or should have known he was violating, *Procunier*, 434 U.S. at 562, 98 S.Ct. at 859. But where is this Court to look for judicial decisions that delineate what is reasonable in executing an unconstitutional general search warrant? What clearly established rights exist under the Constitution that the Marreros were entitled to enjoy during the search and seizure pursuant to such an unconstitutional warrant?

The books are full of cases assessing defective search warrants, but those cases declare the warrants to be unconstitutional and grant the remedy of suppression of the illegally seized evidence. Such a remedy has already been sought by—and granted to—the Marreros. In this case, however, the validity of the warrant was conceded. There simply are no cases concerning themselves with what is and is not reasonable—and, indeed, with what rights the citizenry can expect, or the Constitution guarantee—

under such a concession. If anything, the cases proceed on the assumption that, given a general search warrant, the executing officers will, quite reasonably, seize everything in sight that is arguably covered—which is precisely why general search warrants are themselves unreasonable, and are universally held to be a violation of the Fourth Amendment.

While the constitutional nuances of the particular factual setting of this case could be abstractly debated at considerable length, one thing appears clear beyond peradventure: a young state prosecutor, seven months out of law school, certainly could not have been expected to know that his activities in executing the search warrant in this case, as signed by a judge, were violating anyone's constitutional rights. This is particularly true when the thicket of cases concerning the Fourth Amendment is considered as well. It is possible to find cases that appear to both condone and condemn searches like the one here. In fact, it is even possible to find cases on both sides of the question of the validity of the search warrant here, despite this Court's firm conviction that the warrant was invalid. *Compare Marti, supra,* and *Drebin, supra,* with *United States v. Scharfman*, 448 F.2d 1352 (2d Cir.1971).

Under these circumstances, this Court has no trouble in concluding that the Marreros have failed to carry their burden of proving Rashkind's lack of objective good faith, and have, consequently, failed to defeat Rashkind's qualified immunity. Rashkind is, therefore, entitled to a directed verdict.

### III. CONCLUSION

The six-year saga of this case comprises a sad commentary on the lack of efficacious pretrial procedures in the federal judiciary by which the wheat may be separated from the chaff. While this Court cannot quarrel with the two disinterments of this case by the former Fifth Circuit and the Eleventh Circuit, it is unfortunate that the Marreros could not have been forced to state their theories of recovery with great-

er particularity—and to have thereby exposed the lack of substantial merit in those theories—at an earlier date, and without the necessity of two appeals and an expensive and time-consuming jury trial.

The Court is not, however, unmindful of the advantages that the present disposition of this case provides. By affording the Marreros the opportunity to present what evidence they had to support their theories, this Court is able to assess that evidence with assurance and to find it insufficient, as a matter of law, to impose liability on either of the defendants in this case.

This result has the collateral effect of avoiding what the Court views as an extraordinarily difficult job of drafting instructions for the jury. No one will dispute that Fourth Amendment jurisprudence is one of the most difficult and dynamic of all areas of constitutional law. Likewise, no one will dispute that the reasonableness of searches and seizures is a determination usually made by a judge in the context of a criminal case.

A § 1983 case predicated on violations of the Fourth Amendment and seeking money damages, however, is a civil case in which the plaintiff is entitled to a trial by jury. The task of instructing such a jury sufficiently to enable it to make Fourth Amendment reasonableness determinations—which are frequently of sufficient complexity to engage the attention of the United States Supreme Court, and even then with commonly ununanimous results—would appear to be among the most formidable of all jury instruction problems. The state of the evidence in this case fortunately permits this Court to avoid such a task of judicial omniscience or legerdemain at this juncture.

IT IS THEREFORE ORDERED that the motion of the defendant City of Hialeah for a directed verdict is granted.

IT IS FURTHER ORDERED that the motion of the defendant, Paul Rashkind, for a directed verdict is granted.

IT IS FURTHER ORDERED that the plaintiffs, Juan and Maria Marrero, bear all of the costs of this action.