**Thomas J. RYAN**

v.

**MANSFIELD STATE COLLEGE, Mansfield, Pa.; Donald C. Darnton, and Janet L. Travis.**

**Appeal of Donald C. DARNTON and Janet L. Travis.**

**Nos. 81–2072, 81–2073.**

United States Court of Appeals, Third Circuit.

Argued Jan. 22, 1982.

Decided May 4, 1982.

Rehearing Denied June 3, 1982.

See also, 3 Cir., 677 F.2d 354.

Wayne M. Richardson, Pennsylvania Dept. of Ed., Millersville, Pa., for appellants.

John M. Humphrey (argued), Candor, Youngman, Gibson & Gault, Williamsport, Pa., for appellee.

Before SEITZ, Chief Judge, and ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Defendants Darnton, a former acting president of Mansfield State College (College), and Travis, appointed president on July 1, 1979, appeal from judgments en-

tered on special jury verdicts finding them jointly and severally liable to Ryan, a former member of the College's music department. Pursuant to the jury verdicts, the district court entered judgment in favor of Ryan against both defendants in the sum of $40,988.68 with interest and costs, and separate judgments against Darnton and Travis for additional sums of $6,500 and $3,500 respectively with interest and costs.

The judgments were the result of a two-step proceeding in which the district court first determined on a motion for partial summary judgment that the defendants had, by purporting to accept Ryan's resignation without the approval of the College's Board of Trustees and refusing to reinstate him, deprived him of property in violation of his constitutional right to due process of law. In the second phase of the proceeding, a jury determined that defendants in their actions toward Ryan lacked good faith, and they could, therefore, be held liable for damages. Because we hold that the acting president of the College (President) did have authority to accept Ryan's resignation without Board approval, we reverse.

### I.

Ryan was employed by Mansfield State College as a member of the music faculty from September 1973 until March 12, 1979. Granted tenure in June 1976, he served as faculty director of the College's jazz band as well as a teacher of music. Ryan, upset because he had received notification that he had not been granted a desired promotion and that funds were not available for a student jazz band trip planned for the end of the month, on March 12, 1979, went to Darnton's office and informed him he wanted to resign. When advised there was no special form for resignation, Ryan wrote his own letter of resignation effective immediately. After consulting with the dean of the school of fine arts, the head of the music department, and the vice-president of academic affairs, the President, by letter of March 13, 1979, accepted Ryan's resignation. Darnton did not see Ryan again until Ryan appeared at a meeting of the College's Board of Trustees on April 7, 1979.

Ryan did not report for work after March 12 and the College promptly took measures to find a replacement. It was able to obtain the services on a part-time basis of Albert P. Hamme, a member of the faculty of the State University of New York who was on sabbatical leave. Approximately one-half of Ryan's teaching responsibilities were distributed to Hamme, and the remainder to certain members of the Mansfield faculty "on an overload basis."

On March 23 the President submitted his customary biweekly newsletter to the Board of Trustees and reported Ryan's March 12 resignation. On April 2 Darnton received a letter dated March 31 from Ryan stating, "I would like at this time to withdraw my letter of resignation and request that you not submit the same for approval by the Board of Trustees." Mansfield's Board of Trustees held their next regular meeting on April 7, 1979. After discussion at the meeting participated in by Ryan and Darnton, the Board appointed an ad hoc committee to meet with Darnton to look further into the matter of Ryan's resignation. At this same meeting the Board learned of Hamme's temporary appointment to fill Ryan's former position. The committee met with Darnton on April 18. He expressed his opposition to Ryan's reinstatement and wrote Ryan the following day informing him that the resignation would stand. He advised Ryan that a replacement had been employed but that "a search has been publicized for a permanent replacement" and if Ryan were interested in becoming a candidate he should apply.

At its July 16, 1979 meeting attended by defendant Travis, the Board voted to have its April 7 minutes amended nunc pro tunc to reflect a unanimous Board decision not to accept Ryan's resignation. The Board took no action directing the reinstatement of Ryan. Ryan consulted with his attorney and filed a grievance under the collective bargaining agreement in force between the faculty union, the Association of Pennsylvania State College & University Faculty (APSCUF or Union), and the College, which

was received by the College on June 25, 1979. Ryan's attorney arranged a meeting with the grievance chairman of the Mansfield chapter of the Union but this was cancelled by the College. Ryan submitted another grievance dated October 29, but he testified that "[n]o action was taken" because the "union did not pursue it."[1]

In the fall of 1979 Ryan obtained new counsel and in March 1980 he instituted suit pursuant to 42 U.S.C. § 1983 (Supp. IV 1980).[2]

## II.

Ryan presented his case on the theory that although he had submitted his resignation to the President of the College to take effect immediately, the resignation was ineffective because only the College's Board of Trustees and not the President had final authority to accept it; and that several days prior to the meeting of the Board on April 7, Ryan notified the President by letter that he was withdrawing his resignation. The plaintiff further contended that the Board subsequently rejected his resignation but notwithstanding that rejection, the President reaffirmed the acceptance of the resignation. This, the plaintiff averred, constituted a dismissal without notice and hearing, and so without due process of law (Amended Complaint ¶ 20), and in violation of the collective bargaining agreement between the Commonwealth of Pennsylvania and APSCUF. (Amended Complaint ¶ 23.) The defendants responded that they did not terminate plaintiff's employment but that he "voluntarily resigned his position of employment and simultaneously removed himself from the college." (Answer ¶ 8.)

On January 5, 1981, the district court granted Ryan's motion for partial summary judgment, relying on its previous decision of September 2, 1980 denying defendants' motion to dismiss, in which it had concluded that "under Pennsylvania law the Board of Trustees and not the President had the authority to accept or reject Ryan's resignation." Based on his determination that the President did not have final authority to accept Ryan's resignation, the trial judge in his order of January 5, 1981, summarily ruled that Ryan had been deprived of property without due process of law and ordered him reinstated "to a suspended with pay status."[3] The court ordered the case to

---

**1.** In response to plaintiff's allegations in his amended complaint that he was also terminated in violation of the collective bargaining agreement in force at the time, defendants attached copies of the agreement to their respective answers and asserted that it was Ryan who had violated the contract by quitting and that he had waived his contractual and constitutional rights in his employment by resigning. The answers further averred that if Ryan had been terminated as he alleged, he would have been entitled to arbitration under the collective bargaining agreement but that he failed to pursue his remedies. The contract stated that its grievance procedure, except as otherwise specifically provided in the agreement, was "the sole method for the resolution of grievances." The procedure permitted a faculty member to appeal any discipline or discharge and permitted the Union to seek final and binding arbitration. The record is not clear as to whether Ryan failed to timely pursue his remedies under the contract. The parties have not raised or briefed this question, nor the questions whether the collective bargaining agreement between the parties was exclusive as to the process that was due and, if so, whether a failure to pursue the grievance procedure would preclude a § 1983 *due process* claim.

*See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965) (federal labor policy requires exhaustion of contract grievance procedures prior to a § 301 Labor-Management Relations Act suit alleging contract grievances).

**2.** The original complaint named only Mansfield State College as defendant. In May 1980 Ryan filed an amended complaint joining Darnton and Travis as defendants. In response to motions by all the defendants to dismiss, the district court by order of September 2, 1980, dismissed the claim against the College for monetary damages based on its eleventh amendment immunity.

**3.** The district court ordered reinstatement to a suspended status because Ryan's position had been filled. However, the January 5 order stated that Ryan was to be fully reinstated unless within forty-five days procedures appropriate under the collective bargaining agreement for Ryan's termination were instituted. Ryan claimed that he was reinstated effective January 5, 1981, and that termination proceedings have been instituted against him by the College on the ground that he abandoned his employment on March 12, 1971.

proceed to trial only on the issue of defendants' good faith in their actions toward Ryan.

The district court, in its opinion of September 2, 1980, examined the division of authority between presidents and boards of trustees of state colleges under the relevant Pennsylvania statute, 24 Pa.Cons.Stat.Ann. §§ 20–2001—20–2013 (Purdon Supp.1981) (entitled Article XX, State Colleges and hereinafter referred to as Article XX). The court concluded: "Since it is the Board of Trustees which has the final authority over appointments, it also has the final authority with respect to acceptance of resignations." [4] The district court rejected an interpretation of the Pennsylvania statute that the President had the power to accept Ryan's resignation. The court reasoned:

Neither side has brought any Pennsylvania case law to the Court's attention concerning this statute. The Court notes that the present statute governing state colleges was enacted in 1970 and resulted in more power being given to the presidents. The presidents of the State Colleges now have the authority to appoint faculty members but that authority is clearly subject to the approval of the Board of Trustees. While the Board may not approve an appointment which is inconsistent with the law or standards set by the Executive Board of the Commonwealth, the Civil Service Commission, or the policies of the Board of State College and University Directors, it has the discretionary authority to rest its decision on other grounds. Otherwise, it is difficult to imagine why the Board of Trustees would be the body designated to determine whether the law and standards of the Civil Service Commission had been complied with. Those are determinations that require legal expertise and if the only review contemplated by the legislature is of that nature, it is more likely that the approval of a Commonwealth attorney would have been required. The Court concludes that the power of the Board of Trustees to approve the appointment of employees is something more than a rubber stamp of a president's decisions. Since it is the Board of Trustees which has the final authority over appointment, it also has the final authority with respect to acceptance of resignations.

## III.

As the parties and the district court have acknowledged, the statute makes no reference to the acceptance of resignations.[5] Nor is there any Pennsylva-

4. The district court cited no Pennsylvania decisional law in support of its conclusion but relied on its analysis of the relevant Pennsylvania statute.

5. There is considerable doubt whether a resignation by an employee from service employment effective immediately, as distinguished from a resignation by a public officer, must be accepted to be effective.

Under common law those who had accepted public office could not "throw off their responsibilities at their own pleasure." *Edwards v. United States*, 103 U.S. 471, 473, 26 L.Ed. 314 (1880). In order to protect the public from the inconvenience of being without public servants, resignations of public officials were ineffective until accepted by the appointing authority. *Id.* at 474. Absent constitutional or statutory provision to the contrary this is still the law, and it is the law in Pennsylvania. *Commonwealth v. Krapf*, 249 Pa. 81, 84, 94 A. 553, 554 (1915); *Kelly v. Drab*, 13 Pa.D. & C.3d 652 (1980); 30 P.L.E. *Public Officers* § 45 (1960); *but see*

*Commonwealth v. DeCinti*, 6 Pa.D. & C.3d 670 (1978).

Ryan, as a college professor, was not a public officer. *Pardue v. Miller*, 306 Ky. 110, 206 S.W.2d 75 (1947) (University of Kentucky professor is an employee and not a public officer within the provisions of the state's constitution). In *Smethport Area School Dist. v. Bowers*, 440 Pa. 310, 318, 269 A.2d 712, 716–17 (1970), the Supreme Court of Pennsylvania defined a public officer for purposes of a state jurisdictional statute as one holding "an elective or appointive position in which the incumbent is exercising a governmental function which involves a measure of policy making and which is of general public importance." Though the *Bowers* court cautioned that the definition of public officer could vary depending upon the legal principle at issue, *id.* at 318 n.14, 269 A.2d at 717 n.[14], we have no difficulty in concluding that a college professor at a state college is not a public officer.

Our research has failed to reveal that Pennsylvania law requires acceptance of resigna-

nia case law interpreting the statute with respect to the question of who, under the scheme it sets out, has the authority to accept resignations.[6] For this reason the parties have made arguments as to the legislature's intended division of authority between state college presidents and boards of trustees based on the language of the statute, its legislative history, and a comparison of the statute with its predecessor.

The section of Article XX dealing with the powers of the presidents of state colleges, entitled "Management of State Colleges and State Universities Within the Department," commences:

> Subject to the stated authority of the Board of State Colleges and University Directors and the board of trustees, the president of each of the several State Colleges and State Universities shall administer the institution. Each president shall have the power and his duty shall be:
>
> (1) To appoint such officers, faculty members, graduate assistants, and employes as may be necessary in accordance with law, and the standards set by the Executive Board of the Commonwealth and the Board of State College and University Directors.

24 Pa.Cons.Stat.Ann. § 20–2004.1 (Purdon Supp.1981).

The defendants argue that the presidents' power to appoint and their general managerial responsibilities under the statute vest the presidents with full authority to accept resignations. Therefore, the ar-

---

tions of employees who are not public officers. There are common pleas court cases examining the requirements for resignations of public school teachers in futuro with broad language indicating that resignations, generally, must be accepted. *Molino v. Portage Area School Dist.*, 67 Pa.D. & C.2d 647, 653 (1974) ("It is fundamental contract law that an offer of any type, including an offer to resign, may be withdrawn by the offering party at any time prior to the acceptance of that offer."). *See Furey v. Cheltenham Township School Dist.*, 29 Pa.D. & C.2d 509, 512–13 (1962); *Rice v. Ford*, 2 Pa.D. & C.2d 543, 553 (1954). But these cases arose under a statute which requires that resignations of public school teachers be tendered 60 days before their effective date. We do not find them persuasive that under Pennsylvania law resignations which purport to be effective immediately are ineffective until accepted.

"Voluntary quits" without any formal tender of resignation or acceptance are commonplace every day in industrial settings throughout the nation. Collective bargaining agreements generally provide that seniority of an employee in the bargaining unit is terminated when an employee quits. Where a resignation by its terms is effective immediately and the employee physically severs his employment duties, it is difficult to discern what purpose would be served by a requirement that his resignation must be accepted to be effective. This issue has not been raised or briefed by the parties and we therefore do not reach the question of whether a resignation of an employee such as Ryan which purports to be effective immediately must be accepted in order to be effective. The parties presented the case on the assumption that an acceptance was required.

**6.** That the issue is not addressed by the statute or cases provides partial support for Darnton's contention that he acted in good faith within the meaning of *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 1589, 43 L.Ed.2d 214 (1975), in purporting to accept the resignation. Presidents of state colleges may be liable for damages under § 1983 *unless* they acted in good faith when causing a deprivation of constitutional rights. *Procunier v. Navarette*, 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978) (dictum); *Skehan v. Board of Trustees of Bloomsburg State College*, 590 F.2d 470, 472 (3d Cir. 1978). Thus, if Darnton acted in good faith, he could not be held liable in damages to Ryan even were this court to affirm the district court's conclusion that Ryan's constitutional rights were violated.

Because we conclude that there was no deprivation of Ryan's constitutional rights, we do not reach the question of whether the record shows substantial evidence to support the finding that Darnton and Travis maliciously intended to injure Ryan. It should be noted, nevertheless, that Travis merely maintained the status quo, *see Pinkney v. District of Columbia*, 439 F.Supp. 519, 526–27 (D.D.C.1977) (current president who had no connection with termination of faculty member cannot be held individually liable for damages for exercise of discretion in refusing to reinstate plaintiff to correct the improper action), and acted on the advice of the assistant attorney general in rejecting Ryan's grievance of July 25, 1979, on the ground that it was "untimely" and that Ryan lacked standing under the collective bargaining agreement.

gument continues, Darnton's acceptance of Ryan's resignation terminated Ryan's property interest in the position he resigned. This being the case, there could have been no due process violation.

Ryan counters that under the statute the presidents' power to appoint employees is "[s]ubject to the stated authority of . . . the boards of trustees," and that part of the "stated authority" is the power and duty

> [t]o approve the appointment of all employes in accordance with law, and standards set by the Executive Board of the Commonwealth, the Civil Service Commission, and policies of the Board of State College and University Directors.

*Id.* § 20–2008.2(9). Ryan does not dispute presidential power to accept resignations; rather he argues, and the district court agreed, that because the Board had approval power over appointments, it had corresponding approval power over the acceptance of resignations. Under this theory Ryan was constructively discharged without due process when he was not allowed to resume work after he submitted his withdrawal letter dated March 31, 1979, prior to an approval by the Board[7] of the presidential acceptance.

To bolster their argument that under the statutory scheme the president has power to accept faculty resignations, Darnton and Travis contend that the differences in the statute and its predecessor reveal the intention of the legislature "to create a strong central management authority in the office of the president of the college as opposed to the board of trustees." Darnton and Travis argue that the 1970 amendments made a "radical" change—they shifted managerial authority from the boards to the presidents. An examination of the statute that previously governed state colleges supports this contention, for the powers to appoint employees (on nominations of presidents), fix salaries, and make rules, previously lodged in the boards, are now vested in the presidents.[8]

Comparison of the duties of the presidents and the boards of trustees of Pennsylvania state colleges under the revised scheme of the 1970 amendments leads to the conclusion that while college presidents bear the responsibility for the day-to-day functioning of the colleges, the boards appear to serve an oversight function in matters pertaining to budget, financial commitments, and school policy. The presidents were envisioned as the managers. Following the first provision of section 20–2004.1, which gives the presidents power to appoint employees, are fifteen other provisions giving them responsibility for matters as diverse as establishing campus traffic regulations, authorizing travel of personnel, defining academic standards and standards of admission (in accordance with state regulations) and allocating funds among instructional, administrative, maintenance, and other services. 24 Pa.Cons.Stat.Ann. § 20–2004.1 (Purdon Supp.1981). *See* Appendix A attached. The presidents' responsibilities are consistent with the admonition of the section's introductory statement that the president of each college "shall administer the institution."

In contrast, the boards of trustees play a circumscribed oversight role in the governance of state colleges. There are eleven provisions of section 20–2008.2 which set out the powers of boards of trustees. *See* Appendix B attached. The first six provisions give the boards no managerial or operational responsibilities. Except for a provision authorizing the trustees to establish grievance procedures for employees in accordance with policies established by state agencies, these provisions basically create

---

**7.** The district court in its January 5, 1981, order ruled that there was no question that the Board did not accept Ryan's resignation. "The Board's action in approving the appointment of Ryan's successor shows at most that at a later time the Board acquiesced in what was then a fait accompli."

**8.** Prior to the amendments to Article XX in 1970 the powers of the boards of trustees of

advisory and public relation functions.[9] The last five provisions give the boards approval power over certain specified actions of the presidents pertaining to budgetary and financial commitments.[10] Two other approval powers of the boards are set out in section 20–2004.1(14) & (16) which give the presidents the power, subject to the approval of the boards, to establish rules on employment rights, promotions, dismissals, and tenure, and to contribute to volunteer fire companies.[11]

This view of the division of responsibility between college presidents and boards of trustees is consistent with Rules and Regulations of the State Department of Education as reflected in 22 Pa.Admin.Code § 41.11 (Shepard's 1982). That section reads:

> The president shall administer and manage the college in accordance with the authority granted the president. The president, together with the board of trustees, shall give overall policy direction to the college in accordance with the provisions of Article XX . . . .

We believe that the district court's unsupported conclusion that the Board's final authority to approve appointments also gave it "the final authority with respect to acceptance of resignations" is inconsistent with the statutory scheme. Under the statute the boards are given specific powers of approval over certain of the presidents' actions—in general, over those with financial consequences. The statute's careful enumeration of specific approval powers should not readily be expanded by judicial fiat. There is absolutely nothing in the legislative scheme establishing the balance of powers between the president and the board of trustees that warrants a requirement of joint action over a pedestrian function like the acceptance of an employee's resignation.

Not only is there no reason to imply an approval power not included by the legislature, there are policy reasons for refusing to do so. The Board of Trustees meets only every two months. It would be impractical and hardly consistent with good management of a large educational institution such as a state college to require managerial decisions, including the direction and assignment of employees and acceptance of employee resignations, to await meetings of the board held in intervals of two months. If an instructor resigns effective immedi-

state colleges were set out in 71 Pa.Stat.Ann. § 361 (Purdon 1962) (amended).

**9.** In addition to setting grievance procedures, each board is empowered to make recommendations to the college president, to recommend candidates for president of the institution to the Governor, to represent the state at college functions, to develop public relations programs, and to conduct an annual inspection of the physical premises and based thereon to make recommendations to the Board of State College and University Directors. 24 Pa.Cons.Stat. Ann. § 20–2008.2(1)–(6) (Purdon Supp.1981).

**10.** Under these five provisions, the boards approve the presidents' action on the annual operating and capital budget requirements, purchases not in excess of $1500 without competitive bidding, contracts for consultative services, and recommendations of waiver of fees, as well as the appointment of all employees. *Id.* § 20–2008.2(7)–(11).

**11.** Ryan argues, based on comments in the Pennsylvania House of Representatives prior to the final passage of the 1970 amendments which shifted power to the presidents, that though the presidents were given more authority, the boards retained management responsibilities. Ryan quotes the chairman of the State House Subcommittee on Higher Education that the amendments give the trustees " 'a "beefed-up" role, a vital role to play along with the president[s] in the management of these institutions.' "

Though the subcommittee chairman does stress that local boards will not be mere figureheads, his remarks appear designed primarily to relieve apprehensions about the *statewide* Board of State College and University Directors created by the amendments. The new statewide board, he emphasizes, will permit coordination and statewide planning, but local boards will still fill important functions and local boards and presidents will retain "a certain amount of fiscal autonomy." Pa.H.R.J., June 25, 1969, 153d Sess., 997–99, Bill No. 999 On Final Passage.

The statements in the Bill on Final Passage do nothing to offset the impression created by §§ 20–2004.1 and 20–2008.2 that the presidents are the operational managers of the institutions and the local boards of trustees share presidential authority only in certain limited areas.

ately and implements his resignation by promptly severing his employment, as in this case, action must be taken immediately so that students are not left without a teacher.[12] If the college president could fill such a vacancy on a temporary basis pending the board's meeting, assuming an instructor would accept a position on such terms, and the board rejected the resignation, the students would have another disruption. Even Ryan disapproved of such change in teachers, testifying at the jury stage of the case that "I don't think it's good for students to be jerked around in the middle of a semester."

Thus, it is undisputed that when Ryan submitted his resignation and walked away from his job, the College had to act immediately.[13] Even Ryan claimed to have assisted in the scramble to find a replacement. Deferring the acceptance of the resignation for almost four weeks until the Board met would not have served any useful purpose. The College could not compel Ryan to work meanwhile; it had to seek help elsewhere.

The reasonableness of a rule allowing presidents to accept resignations is evidenced by the use of that procedure at the College. For years it had been the practice of the President to accept resignations of the faculty. To support his case in the jury phase of the proceedings, Ryan called two of the Board's trustees. One, Duane Van Noy, a practicing attorney, conceded on cross-examination that this was the first time the Board had ever attempted to take any action on employee resignations. He testified:

Q. And insofar as Dr. Park [Darnton's predecessor as president] and Dr. Darnton were concerned, wasn't it in fact true that the Board of Trustees had never taken any action on any employee resignations.

A. I think you're right. I think this was the first time that we were asked to consider this and it's the first time that we did and we felt that we did it properly and in good faith.

Q. Is it in fact true that the president always accepted employee resignations.

A. He did. Dr. Park always took the position that he decided everything, but that was Dr. Park. We didn't take that position.

The other trustee, Dr. Watkins, acknowledged that in view of the summary resignation, Dr. Darnton had to do something and that it had been the practice at the College for the President to act on resignations. Darnton also testified that on other occasions he and not the Board had accepted

---

12. Recognition that immediate resignation of a faculty member "needs administrative attention at once" led the court in *Kieval v. Wilson,* 285 A.D.2d 1203, 140 N.Y.S.2d 756, 757 (1955), to hold that the college president had authority to accept a resignation under a provision of the bylaws of the Board of Higher Education of the City of New York which allowed the president to make "such administrative arrangements as 'cannot well await'" board action. *But see Lemlich v. Board of Trustees of Harford Community College,* 282 Md. 495, 385 A.2d 1185 (1978), which holds that only the board of trustees can accept resignations and that Lemlich's withdrawal of her resignation prior to board consideration was effective.

The *Lemlich* court based its holding on the Maryland statute governing community colleges which vested in the boards of trustees "the power '[t]o maintain and exercise general control over the community college ..., and to adopt reasonable rules, bylaws, or regulations to effectuate and carry out'" the statute's provisions. 282 Md. at 500, 385 A.2d at 1188.

Though the factual situation of *Lemlich* is similar to that of the instant case, the statutory scheme is not. The relevant Pennsylvania statute gives no general power to the boards of trustees. Rather, subject to the "stated" powers of the boards, the presidents are to administer the state colleges. We do not, therefore, find *Lemlich* persuasive that only the Board could effectively accept Ryan's resignation.

13. Several weeks after his resignation on March 12, when Ryan endeavored to retract his resignation, his letter of withdrawal attempted to dissemble his severance of employment. The letter commenced: "While I have been away for the last few weeks on sick leave, I have had a chance to review some of the problems that I discussed with you and members of my department." Under oath before the jury, however, he acknowledged that he "didn't ask for [sick] leave because under the circumstances I wasn't given an opportunity or it didn't occur to me to do that."

resignations of faculty members, and that he considered such action part of his official duties. The Board had never interceded. He merely informed the Trustees in his biweekly newsletter of the resignations that had taken place. Dr. Watkins treated the biweekly reports in which resignations were listed so perfunctorily and secondarily that he usually did not read them until he arrived at the next Board meeting.[14]

We also find support for the result we reach in the collective bargaining agreement binding the College, its Board of Trustees, and the faculty Union. The written agreement, dated October 2, 1974, and in force in March and April 1979, was entered into by and between the Commonwealth of Pennsylvania for and on behalf of itself, the Department of Education, the State Board of Education, the Council of Higher Education, the Board of State Colleges and University Directors, the State Colleges and Indiana University (Colleges) and their respective Boards of Trustees, of the first part, and the Association of Pennsylvania State College and University Faculties, of the second part.[15]

The contract painstakingly sets up a system for faculty appointments which specifically provides that it is "the President [who] approves the filling of an opening within a department." Art. XI A2a(1). No mention whatsoever is made of the boards of trustees. Appointments are initiated and recommended by the department faculty and the recommendations are submitted to the president or his designee "who may accept or reject the recommendation of the department FACULTY and that decision shall be final." Art. XI A2c. Then, if the president agrees with the department faculty recommendation, "he/she shall make the appoint-

ment . . . to such rank and at such salary as he/she shall deem appropriate." Art. I A2. The contract provides for a similar process in the filling of administrative faculty positions and establishes detailed evaluation procedures for tenured faculty. No role is provided for the trustees in the entire process. Thus, even if the power to accept resignations depended upon the power to appoint, the Commonwealth, its responsible departments and agencies, together with the boards of trustees of the state colleges, have authorized the college presidents to act on behalf of the Commonwealth and the colleges on faculty appointments.

## IV.

We therefore hold that the power to act on behalf of Mansfield State College in the acceptance of resignations of faculty members was vested in the College President. Accordingly, the judgment of the district court will be reversed and the case will be remanded with directions to enter judgment in favor of the defendants. Each side to bear its own costs.

## APPENDIX A

### § 20-2004.1 Management of State Colleges and State Universities within the department

Subject to the stated authority of the Board of State College and University Directors and the boards of trustees, the president of each of the several State Colleges and State Universities shall administer the institution. Each president shall have the power and his duty shall be:

(1) To appoint such officers, faculty members, graduate assistants, and employes

---

14. He testified:
   Q. You don't read it [the biweekly newsletter].
   A. I take it with me to the Board meeting, then I read it.
   Q. You don't read it when you get it in the mail.
   A. No, not usually. I take it all with me to the Board meeting.
   Q. So you actually wouldn't have known until you show[ed] up at the Board meeting as to whether or not Mr. Ryan's resignation was on there.
   A. Right.

15. In 1970 the Pennsylvania legislature enacted the Public Employee Relations Act, which authorizes public employers, including state educational institutions, and their employees to engage in collective bargaining, to reduce their agreement to writing and have it signed by the parties. Pa.Stat.Ann. tit. 43, §§ 1101.101 to 1101.2301 (Purdon Supp.1981).

as may be necessary in accordance with law, and the standards set by the Executive Board of the Commonwealth and the Board of State College and University Directors.

(2) To fix the salaries of instructional and noninstructional employes in accordance with law, and the standards set by the Executive Board of the Commonwealth and policies of the Board of State College and University Directors.

(3) To make rules for the administration of the college or university including rules under which student organizations may be created and operated.

(4) To prepare and submit, with the approval of the boards of trustees, the annual operating and capital budget requirements for the institution.

(5) To determine from appropriations, fees and other available funds, the expenditures to be made for instructional, administrative, custodial and maintenance services, equipment and supplies, and for furniture for instructional, administrative and service facilities, and to reallocate such sums among the various expenditure classifications as may be necessary for the effective management of the institution, providing that no such reallocation shall exceed the available allocations of the institutions.

(6) To purchase instructional materials, educational, technical, administrative, custodial and maintenance equipment and supplies not in excess of a cost of one thousand five hundred dollars ($1,500) without competitive bidding with the approval of the Board of Trustees, after notice to the Secretary of Property and Supplies, except that such items shall not be bought in series to avoid the dollar ceiling, nor shall any items be included for which the Department of Property and Supplies has contracts, either through schedules or group purchase contracts, current or proposed.

(7) To cooperate with and accept grants and assistance from Federal and State agencies, foundations, industrial corporations, or any other source in the prosecution of research or educational projects including purchase of equipment. Each college and university shall have the power to bank and use such grants as directed by the grantor, subject, however, to the provisions of clause (6) of this section, where applicable. All moneys received from such sources are hereby appropriated to each of the several State Colleges and State Universities granted such moneys. All such moneys shall be subject to audit by the Auditor General.

(8) To authorize personnel to travel within or without the Commonwealth at State expense in accordance with regulations of the Board of State College and University Directors.

(9) To make rules for the admission, control, and movement of persons and vehicles, and the parking of vehicles on the campus or other land of a State College or State University and to provide reasonable charges for the use thereof, as well as reasonable penalties for the violation of said rules.

(10) To define academic standards and standards for admission in accordance with regulations of the Board of State College and University Directors.

(11) To make contracts with school districts, agencies or corporations so that students may engage in student teaching or other professional training in order to obtain experience in a particular field.

(12) To fix student activity and related fees in accordance with policies established by the Board of State College and University Directors.

(13) To enter with the approval of the Board of Trustees into contracts for consultative services not to exceed one thousand dollars ($1000).

(14) To establish rules regarding employment rights, promotions, dismissals and tenure of faculty and other employes, subject to the approval of the Board of Trustees and in accordance with broad policies established by the Board of State College and University Directors.

(15) To determine institutional memberships in learned societies and professional organizations which will have significance

to the welfare of the institution within the limits established by the Board of State College and University Directors.

(16) At his discretion, to make contribution to those volunteer fire companies that provide fire protection to the property of State Colleges and State Universities, subject to the approval of the Board of Trustees.

## APPENDIX B

### § 20–2008.2 Duties of Boards of Trustees of the several State Colleges

The Board of Trustees of each of the several State Colleges shall have the powers and its duties shall be:

(1) To review all matters pertaining to the welfare and well-being of the college and its students and to make recommendations to the president with respect thereto.

(2) To recommend to the Governor through the Board of State College and University Directors the appointment of a president.

(3) To represent the Commonwealth at official functions of the college.

(4) To develop means and methods of establishing proper relations and understanding between the college and its program and the public in order to serve the interests and needs of both.

(5) To establish grievance procedures for State College employes in accordance with policies established by the appropriate Commonwealth agencies.

(6) To conduct an annual physical inspection of facilities and make recommendations to the Board of State College and University Directors.

(7) To approve the annual operating and capital budget requirements for the institution prepared by the president and to forward same to the Board of State College and University Directors.

(8) To review and approve all direct purchases made by the president without competitive bidding.

(9) To approve the appointment of all employes in accordance with law, and standards set by the Executive Board of the Commonwealth, the Civil Service Commission, and policies of the Board of State College and University Directors.

(10) To review and approve contracts for consultative services entered into by the president.

(11) To approve recommendations of the president pertaining to the waiver of fees.